AO 91 (Rev. 11/11) Criminal Complaint                                     AUSA Megan DeMarco (312) 371-5698

**FILED**
7/27/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JUAN MENDOZA and
JUAN RAMIREZ

CASE NUMBER: 23 CR 423

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

*Code Section*

*Offense Description*

Count One
Title 21, United States Code, Section 841(a)

On or about July 26, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, JUAN MENDOZA possessed with intent to distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance.

Count Two
Title 21, United States Code, Section 841(a)

On or about July 26, 2023, in the Northern District of Illinois, Eastern Division, JUAN RAMIREZ distributed a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance.

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

ANGEL SANCHEZ
Special Agent, Federal Bureau of Investigation
(FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 27, 2023

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, ANGEL SANCHEZ, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since approximately August 2020. I also previously served as an FBI Police Officer at FBI Headquarters in Washington, D.C., from approximately February 2016 to August 2020. As part of my duties as a Special Agent with the FBI, I investigate criminal violations relating to narcotics trafficking, money laundering, and firearms offenses, including, but not limited to, violations of Title 18, United States Code, Sections 922, 1956, 1957, and 1962, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963.

2.      My official FBI duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to, offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. § 1956.

3.      I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking. I have also participated in multiple investigations involving illegal drug trafficking by drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers

conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their methods for concealing narcotics and narcotics proceeds and their use of violence and threats of violence to protect their organization.

4. Through these investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, and import controlled substances. For example, I am familiar with drug trafficking patterns between Latin America and the United States. I also have become familiar with the methods used by narcotics traffickers to safeguard and distribute narcotics and to collect and launder narcotics proceeds. I also am familiar with their use of prepaid cellular and cellular phones, land line phones, public phones, debit calling cards, counter-surveillance, the use of false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics in an attempt to disguise the true meaning of the conversation. I also know that consensually monitored telephone calls, as well as court-authorized intercepts, often provide valuable evidence of conspiracy pertaining to the narcotics trafficking activities.

5. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transactions, attempt to conceal, disguise, or legitimize unlawful proceeds through domestic and international banks and their attendant services, securities brokers, professionals, such as

attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use wire and electronic communications to communicate with co-conspirators in furtherance of their money laundering activities.

6. The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal and local law enforcement officers; (c) review of recorded calls and meetings; (d) information from cooperating sources; and (e) my training and experience and the training and experience of other law enforcement agents.

7. Because this Affidavit is for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of an arrest warrant, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the individuals and events described in this Affidavit.

## FACTS SUPPORTING PROBABLE CAUSE

### *Summary of Probable Cause*

8. In summary, and as set forth in more detail below, from on or about July 19, 2023 to on or about July 26, 2023, a law enforcement confidential source (the CS)[1]

---

[1] The CS has been cooperating with federal law enforcement since approximately January 2022, in the hopes of receiving monetary compensation and/or immigration benefits. The CS has been paid $6,500 to date. Law enforcement has not made promises to The CS in regard to what the CS will receive for the CS's cooperation. The CS has one prior felony conviction for domestic battery. The CS has provided reliable information that law enforcement has

communicated with JUAN MENDOZA about buying a kilogram of cocaine and a kilogram of heroin from MENDOZA. Based on agents' observations of MENDOZA's movements and the recorded calls with the CS, as detailed below, law enforcement believes that MENDOZA retrieved a kilogram of suspected heroin from an auto body repair shop on S. Western Avenue in Chicago that is associated with JUAN RAMIREZ. On or about July 26, 2023, MENDOZA met with the CS in Chicago and attempted to give the CS a kilogram of suspected heroin.

9. Following his arrest, MENDOZA recorded calls with RAMIREZ, who told MENDOZA, in summary, to bring the narcotics back or pay for them. Accordingly, law enforcement believes that RAMIREZ supplied MENDOZA with the kilogram of suspected heroin.

### Background of Investigation
### and Identification of MENDOZA and RAMIREZ

10. In or around January 2022, the CS began cooperating with law enforcement. The CS told law enforcement, in sum and substance, that approximately three years earlier, the CS had met someone that the CS knew as "Vuki" through the CS's work as a semi-truck mechanic in Chicago. According to the CS, "Vuki" was also a mechanic, who, in early 2019, began offering to sell the CS narcotics and discussing possible future drug transactions. In or around January of 2022, at the direction of law enforcement, the CS re-established contact with "Vuki" and they resumed conversations about future narcotics related transactions.

---

corroborated through independent investigation, including toll records, recorded conversations, and in-person surveillance.

11.    Law enforcement subsequently identified "Vuki" as JUAN MENDOZA as follows. On or about January 19, 2022, the CS met up with MENDOZA. According to agents on surveillance, MENDOZA was driving a tan Buick LeSabre bearing license plate BQ76937 and Vehicle Identification Number 1G4HR54KX44118245. According to Illinois Secretary of State records, this car was registered to an individual related to MENDOZA at an address in the 7700 block of South Keating Avenue in Chicago. According to law enforcement records, MENDOZA resides at that address. Law enforcement subsequently showed a driver's license photo of MENDOZA to the CS, and the CS identified MENDOZA as "Vuki." Further, law enforcement agents on surveillance compared their observations of the individual who met up with the CS in January of 2022 with the driver's license photo of MENDOZA and determined them to be the same person.

12.    As part of this investigation, law enforcement observed MENDOZA meeting with an individual later identified as JUAN RAMIREZ on multiple occasions. For example, on August 12, 2022, law enforcement conducting surveillance on MENDOZA observed him park in an alleyway behind an auto body repair shop located on the 5900 block of S. Western Avenue in Chicago.

13.    On or about August 24, 2022, law enforcement conducted surveillance on the auto body repair shop on S. Western Avenue. At 10:10 a.m., law enforcement observed an individual park a blue Dodge Caravan bearing Illinois license plate CN94140 in front of the auto body repair shop. The individual exited the car, unlocked the front door of the shop with keys, and went inside. At 10:34 a.m., MENDOZA

arrived at the same location and went inside the store. Six minutes later, MENDOZA left the shop and drove away. At approximately 10:50 a.m., the individual driving the blue Dodge drove away.

14.    On or about September 8, 2022, at approximately 9:30 a.m., law enforcement on surveillance at the auto body repair shop on S. Western Avenue observed the same individual driving the blue Dodge. Law enforcement conducted a traffic stop of the blue Dodge for no front license plate. The driver identified himself as JUAN RAMIREZ.

### *July 19, 2023: MENDOZA Offers to Sell the CS Kilogram Quantities of Narcotics*

15.    On or about July 19, 2023, the CS informed law enforcement that he/she had run into JUAN MENDOZA, and that MENDOZA offered to sell the CS kilogram quantities of different narcotics, including cocaine and heroin. This interaction was not recorded because the CS ran into MENDOZA unexpectedly.

16.    According to the CS, MENDOZA provided the phone number 773-209-1592 (MENDOZA Phone).[2]

17.    On or about July 19, 2023 at the direction of law enforcement, the CS recorded a conversation with MENDOZA at MENDOZA Phone. The CS stated, "Hey old man, about the lady that you told me about, not the blonde one or the other one,

---

[2] According to law enforcement databases, this phone was not registered to any named subscriber or listed address.

Law enforcement identified this phone as belonging to MENDOZA based on the CS's representation that MENDOZA had provided that phone number, as well as comparing the voice in the recorded calls to other recorded calls made by MENDOZA in the course of this investigation.

but the other one."[3] MENDOZA replied, "Where are you at right now?" The CS responded, "Over here eating at my house." MENDOZA replied, "Oh you're by your house, I'm over here by 31st street on my way to Cicero." The CS replied, "What's the average price? To see how much it is for the full, I don't know, full time." MENDOZA asked, "For what?" The CS stated, "The one's that look like a doe. You understand me? The one that you told me about right now. You told me about three, the one in the middle." MENDOZA responded, "The tire from the other time? [Fentanyl previously purchased from MENDOZA]." The CS responded, "Yes, yes. No, no not the same one from the other time. You told me about another one." MENDOZA replied, "Because there's one, a Firestone [Fentanyl]." The CS stated, "The, the glass one. [Heroin]." MENDOZA replied, "There's Firestone [Fentanyl] and another one, its Hercules. [Heroin]." The CS responded, "Okay. The, the one of glass, that one. How much do you have them for the full thing?" MENDOZA answered, "About 40 [$40,000]." The CS responded, "Okay, but you do have someone who is ready when it's needed?" MENDOZA responded, "No [unintelligible] like right now in the evening and for the next day." The CS replied, "Oh okay. Then I'll let you know. Over here I

---

[3] The summaries of recorded conversations in this affidavit do not include reference to all of the topics covered during the conversations or all statements made by the speakers on the topics that are described. In certain of the paragraphs describing conversations set forth above, interpretations of the discussion are included in brackets. These interpretations include meanings attributed to code words, coded language, or vague references used by the speakers. My understanding and interpretation of the conversations is based upon the contents of the conversations, the context of both prior and subsequent intercepted conversations, my knowledge derived from this investigation, my training and experience, and the training and experience of other law enforcement agents. All of the communications between MENDOZA and the CS, and MENDOZA and RAMIREZ, referenced in this affidavit were in Spanish and have been translated for the purpose of this affidavit by a fluent Spanish speaker. Translations are approximate and are drafts.

got some individuals who like to go to the sky every once in a while, ride around in a plane." MENDOZA responded, "Yes, because remember last time I told you about Fernando [Fentanyl]." The CS replied, "Yes, yes, yes." MENDOZA explained, "It's Fernando. And the other one is Ernesto [Heroin]." The CS replied, "There you go, that one." MENDOZA replied, "The Ernesto? Yes, yes." The CS responded, "The Ernesto. I need to get situated and go speak with the ones in the sky, the man from the sky." MENDOZA replied, "Or if you want, I'm going to be around here. I'm on the way to the yard. I'm going to stop by the bank and take out some payments." The CS replied, "If it gets done, I'll also be in the yard working where you saw me." MENDOZA responded, "And I'm right here, look at that." The CS responded, "Okay. Just let me be available and I'll throw you a cable or we can see each other, whatever we agree on." MENDOZA agreed, "Yes that's better."

18.     Based on my training and experience and training and experience of other law enforcement officers involved in this investigation, I believe MENDOZA told the CS that he could sell the CS a kilogram of heroin for $40,000. In my training and experience, "glass" is a common slang term for heroin.

### July 20, 2023: MENDOZA and the CS Meet to Discuss a Future Narcotics Transaction

19.     On or about July 20, 2023, the CS and MENDOZA made plans to meet up near 31st Street and Kilbourn Avenue in Chicago. According to my review of the CS's recording device from this meeting, the CS met MENDOZA at approximately 12:50 p.m.

20.     According to my review of the recording, and a debrief with the CS, the CS stated, "How do you have the fentanyl? That's per pound right?" MENDOZA replied, "It's per gram." The CS responded, "The other time, how much did I buy?" MENDOZA replied, "100 [grams]." The CS responded, "100 grams. How much was it? $5,000?" MENDOZA stated," It was $5,500. But right now I got it for 45, being $4,500." The CS replied, "Oh so it's cheaper now." MENDOZA confirmed, "Yes." The CS responded, "$4,500. 45 per gram." MENDOZA confirmed, "45 per gram." The CS asked, "Okay. And the heroin, is that per pound or kilo?" MENDOZA answered, "That one however you want it. Kilo as well or however." The CS responded, "Okay because these gang members love to inject that." MENDOZA replied, "The heroin?" The CS stated, "Yes, yes." MENDOZA responded, "Even the fentanyl is being injected." The CS replied, "No way. That shit kills people." MENDOZA responded, "Why do you think…" The CS responded, "From what I know, remember what you told me that it kills people." MENDOZA responded, "I don't know with what they mix it with, but they're also using that." The CS replied, "Okay, but it's a kilo for 40 right? For the heroin. Or is it per pound?" MENDOZA responded, "No it's per kilos." The CS replied, "Kilo for 40." MENDOZA confirmed, "Yes. 40 per gram. Its $40,000 per kilo." The CS responded, "So if I grab a couple grams of heroin. For example about 50 grams, how much would that be? MENDOZA responded, "Two thousand, I think. It's 40. 50 times 40 is two thousand dollars." The CS responded, "Okay. Cause these guys aren't going to grab a lot, maybe. I'm not sure I got to meet with them. If you have the merchandise…" MENDOZA replied, "Yeah I got it available." The CS replied, "It's

9

available? Okay. They'll like that shit?" MENDOZA responded, "They'll love it." The CS replied, "They'll love it? Then the kilo you have it for 20. We have to work." MENDOZA stated, "The white one yeah." The CS stated, "When I have the money I'll call you and let you know I got the money." MENDOZA replied, "Just how I told you, if you tell me I need 50 or 100 grams, it'll be for the next day." The Cs responded, "So I got to tell you a day before?" MENDOZA replied, "At least, yes. Or it just depends." The conversation continued before MENDOZA stated, "Just remember the "H" is Hercules or Hector. And the "F" is Fernando or Federico which is for Fentanyl." The CS responded, "Fentanyl and the other one is for heroin." MENDOZA confirmed, "The 'H.' Yes." The CS replied, "Okay. And the white one is Victor? [Cocaine]" MENDOZA replied, "Yeah, Victor." The CS later confirmed, "Oh okay. So the gram for fentanyl is 45." MENDOZA stated, "45 and the 'H' is 40." The CS reiterated, "The 'H' is 40." MENDOZA confirmed, "Yes." The CS responded, "It's set. You said it." MENDOZA continued, "The other one you already know, it's 20 for the full thing." The CS stated, "Okay its set. Take care." MENDOZA asked, "Can you do it with the white one?" The CS replied, "The white one? Yeah there's clients. How much can you get 1 or 2?" MENDOZA replied, "You just let me know. It's 20 and however much you want." The CS replied, "Okay its set. I'll let you know."

21.     Following the meeting, the CS sent the audio recording of the meeting to law enforcement.

*July 25, 2023: MENDOZA and the CS Discuss the Future Narcotics Transaction*

22.     On or about July 25, 2023, at approximately 8:36 a.m., the CS called MENDOZA at MENDOZA Phone. The CS placed an order for the narcotics previously discussed. The CS stated, "One of each. The papers are ready, I'll go pick them up." MENDOZA asked, "How? Complete?" The CS replied, "Yes, yes. One of each." MENDOZA responded, "That's what I wanted to talk to you about." The CS replied, "Victor and Hercules [cocaine and heroin]." MENDOZA asked, "What?" The CS responded, "One Victor and one Hercules." MENDOZA replied, "Oh a Victor." The CS stated, "One of Victor and one of Hercules." MENDOZA replied, "Oh I thought you wanted Fernando [fentanyl]." The CS stated, "No, no. Victor and Hercules." MENDOZA replied, "Okay." The CS stated. "The papers [money] are set. I just got to get up. Go ahead and go, I got it all signed." MENDOZA responded, "Okay. Remember there's Victor, Hercules and Fernando [cocaine, heroin, and fentanyl.]." The CS replied, "Yes, I remember. For them it's Hercules and Victor. One of each." MENDOZA responded, "Okay. Just give me some time because as of right now the place is closed over there. They open at like 10." The CS replied, "Okay." MENDOZA replied, "I'll call you when it's set."

23.     On the same date, law enforcement established surveillance at MENDOZA's residence, located in the 7700 block of South Keating Avenue in Chicago. At approximately 9:41 a.m., agents observed MENDOZA leave his home in a maroon Cadillac bearing Illinois registration DS61253. According to Illinois

secretary of state records, this vehicle is registered to a relative of MENDOZA's at the same address.

24.     At approximately 11:05 a.m., law enforcement observed MENDOZA arrive and park in the rear alley behind 5950 South Western Avenue in Chicago, the same auto body repair shop referenced above. A few minutes later, MENDOZA attempted to call the CS twice and texted the CS once. Law enforcement then observed MENDOZA exit his vehicle and appear to enter the auto body repair shop through the rear. At approximately 11:18 a.m., MENDOZA exited the building and returned to his car.

25.     At approximately 11:19 a.m., once MENDOZA was inside his vehicle, he called the CS from MENDOZA Phone. The CS asked, "Where are you?" MENDOZA replied, "I came to check it out over here [see the narcotics]." The CS replied, "Okay. Around what time will you be ready?" MENDOZA replied, "You tell me." The CS replied, "I'm ready. I just got to go to my house, pick up the papers [money] and I'm set." MENDOZA responded, "Hold on, let me call you back to tell you exactly what time." The CS replied, "Okay call me back so I can know what time. I already got them too." MENDOZA responded, "You told me you needed Hercules and, what's it called, Hector and…" The CS confirmed, "Victor and Hercules [cocaine and heroin]." MENDOZA replied, "Hector and Victor right?" The CS stated, "Yes." MENDOZA replied, "Alright then, I'll go ahead and call you back."

26.     After this call, law enforcement observed MENDOZA exit his vehicle and return to what appeared to be the rear of the building.

27.     Based on my training and experience, the training and experience of other law enforcement officers involved in this investigation, the recorded calls with the CS, and my familiarity with this investigation, I believe MENDOZA was going into the auto body repair shop to check on the narcotics with his supplier. At approximately 11:25 a.m., MENDOZA departed the area in his vehicle.

28.     At approximately 6:09 p.m., MENDOZA asked the CS to meet up at 59th and Kedzie. At approximately 6:13 p.m., MENDOZA stated he would have to meet his supplier around 59th. In a recorded call around 6:51 p.m., MENDOZA stated he was near 59th and Western, which is just north of the auto body repair shop at 5950 S. Western Ave. Accordingly, law enforcement believes MENDOZA was traveling to meet the CS from the auto body repair shop.

29.     At approximately 6:35 p.m., agents met up with CS at a predetermined meet location and searched him for money and property, with none found. Agents equipped the CS with audio/video recording equipment and maintained constant surveillance on the CS as he/she drove to meet MENDOZA.

30.     At approximately 7:10 p.m., agents observed MENDOZA arrive at 5724 S. Kedzie Ave. in Chicago. According to my review of the recording and a later debrief of the CS, MENDOZA told the CS, in summary, that the narcotics were not available for distribution.

31.     After the meeting, law enforcement established surveillance at the auto body repair shop on S. Western Ave. At approximately 7:24 p.m., shortly after the meeting with the CS, agents observed MENDOZA arrive at the auto body repair shop

and park at the rear entrance. MENDOZA appeared to go inside through the back door.

32.     Following the meeting, agents met up with the CS at a predetermined meeting location, recovered the recording equipment, and debriefed the CS.

### *July 26, 2023: MENDOZA Sells the CS a Kilogram of Suspected Heroin*

33.     On July 26, 2023, at approximately 10:58 a.m., MENDOZA had a recorded telephone conversation with the CS over MENDOZA Phone. During the call, MENDOZA stated, "Right now I'm going to get that done. I'm going all the way over there to get everything [retrieve the narcotics]." The CS stated, "Call me when you have it all in hand because I don't want to…" MENDOZA replied, "No, no, no. I'm going there now and when I have them in hand I'll tell you to come." The CS replied, "If you have it in hand, call me, tell me to go and set." MENDOZA confirmed, "Okay." The CS replied, "Give and give then everyone goes home." MENDOZA responded, Okay then, when I have them in hand I'll tell you." The CS responded, "Yes because that guy kept nagging that he wanted the money. I told him to wait to let me work something out." MENDOZA responded "Okay then. When I have them in hand, I'll call you so you can come right away." The CS responded, "Alright then. When you have them in hand call me and we'll see each other around." MENDOZA replied, "Yes because right now the only one I got is Hector [there is only heroin available at the moment]." The CS responded, "The one from yesterday, yes, yes."

34.     At approximately 11:45 a.m., law enforcement established surveillance at the auto body repair shop on S. Western Ave.

35.    At approximately 3:08 p.m., law enforcement observed MENDOZA's vehicle arrive at the auto body repair shop and park at the rear of the building. MENDOZA exited his vehicle and entered the business.

36.    At approximately 3:17 p.m., MENDOZA called the CS from MENDOZA Phone. MENDOZA stated, "Remember how I told you yesterday that some guy arrived for 5? When I got there, it turns out that, I left two hands, and when I got here there was nothing there." The CS's response was unintelligible. MENDOZA continued, "I called down there right away and they said the friend said he was going for two. I said how? He told me 5. They said no, no. They are calling him and the brother, but none of them answer. They're going out to find the men. I told them, well go. Because this past weekend I left two hands." CS replied, "Is Hector there or no?" MENDOZA replied, "What?" CS replied, "Hector." MENDOZA responded, "Hector is over there." CS replied, "When you have Hector call me. I'll see how I do it to pick up Hector." MENDOZA replied, "The other one, I'll have it tomorrow." CS replied, "Let me know when you got Hector so I can send someone to pick up the papers because I'm working."

37.    Based on my review of this recording, my training and experience, and my familiarity with this investigation, I believe that during this call, MENDOZA stated there was some miscommunication and the cocaine was not available, but the heroin was available. The CS asked for MENDOZA to deliver the heroin.

38.    At approximately 3:23 p.m., the CS sent MENDOZA a text message stating, "Come to 31st and Cicero because I don't have anyone to send." The two

agreed and set a meeting location around this general area. At approximately 3:55 p.m., law enforcement observed MENDOZA depart the area of the auto body shop in his vehicle.

39.     At approximately 4:20 p.m., law enforcement met with the CS and searched the CS for money and contraband with negative results. Agents equipped the CS with an audio recording device and transmitter and followed the CS to the meeting location. Surveillance was maintained at all times.

40.     At approximately 4:28 p.m., surveillance observed MENDOZA arrive in the area. MENDOZA met the CS at the underpass of 31st Street, located at the intersection of Frontage Road and South Kilbourn Ave. MENDOZA parked in front of the CS and proceeded to enter the CS's vehicle. According to the CS, MENDOZA handed him a plastic bag containing a brick-shaped object. Law enforcement arrested MENDOZA and recovered a black plastic bag containing a brick-shaped object wrapped in brown packing tape located on the floorboard of the rear passenger seat.

41.     A field test of the narcotics was inconclusive. On July 27, 2023, agents took the brick-shaped object to the DEA Laboratory, where it tested positive for 1138 grams of fentanyl.

### MENDOZA Records Calls with RAMIREZ

42.     Law enforcement transported MENDOZA to an FBI location for processing and interview. After being advised of his *Miranda* Rights and agreeing to cooperate with the investigation, MENDOZA stated that an individual named JUAN RAMIREZ had asked MENDOZA to deliver a package to an individual. MENDOZA

stated he knew it was a drug of some sort but did not know specifically what it was. MENDOZA eventually confessed he knew he was delivering heroin to this individual. MENDOZA admitted that he picked up the narcotics from the auto body repair shop on S. Western Avenue in Chicago from JUAN RAMIREZ. Law enforcement showed MENDOZA an Illinois Secretary of State picture of JUAN RAMIREZ, and MENDOZA that RAMIREZ was the man that had ordered him to deliver the narcotics.

43. At approximately 5:04 p.m., MENDOZA agreed to help law enforcement record conversations with RAMIREZ. MENDOZA provided 312-458-5271 for RAMIREZ (RAMIREZ Phone).[4]

44. In the presence of agents, MENDOZA called RAMIREZ Phone and stated, "I'm waiting for this guy. He is enroute." RAMIREZ replied, "Don't tell me that." MENDOZA responded, "Yes." RAMIREZ replied, "Is everything okay or what? I thought he was there." MENDOZA replied, "I'm waiting for him. I'm telling you, 5-10 minutes he'll be here."

45. At approximately 5:39 p.m., MENDOZA called RAMIREZ at RAMIREZ Phone and stated, "This guy says this is not what you had said it was, heroin." RAMIREZ replied, "Uhhh ... well what are you going to do?" MENDOZA stated, "I don't know, I think I should come back or what? I don't know what I'm going to do, I can't be on the street." RAMIREZ replied, "What did the guy say?" MENDOZA stated,

---

[4] According to law enforcement databases, this phone is registered to JUAN RAMIREZ at an address in the 5900 block of South Kedzie Avenue in Chicago, which is the address for a Cricket Wireless store.

"He told me that." RAMIREZ asked, "Then he doesn't want it?" MENDOZA stated, "No. I'll call you back. Ok?" RAMIREZ replied, "Why are you going to call me back? Are you on your way back or what's going to happen? Does he want it or not want it? What's going to happen?" MENDOZA responded, "I'll just come back, okay?"

46. At approximately 5:42 p.m., MENDOZA had another recorded conversation with RAMIREZ over RAMIREZ Phone. During the call, MENDOZA asked, "Hey, he wants to know if you have something different?" RAMIREZ replied, "No, just come back already, it's nighttime. Why you keep looking, if he doesn't want it, that's that." MENDOZA replied, "Okay." RAMIREZ continued, "Do you understand me?" MENDOZA stated, "Okay."

47. At approximately 6:02 p.m., MENDOZA had a recorded voice conversation with RAMIREZ over RAMIREZ Phone. During the call, MENDOZA stated, "I don't know what the fuck happened. I was there with the guy and a truck came up and they took everything." RAMIREZ asked, "What?" MENDOZA continued, "I don't know what the hell but they came and they took everything." RAMIREZ replied, "They took everything?" MENDOZA replied, "Yes, everything including the other guys [money]. They took everything. I don't know what's going on. They came with guns and all out of a black truck" RAMIREZ replied, "I don't know what to tell you. What are you going to do now?" MENDOZA replied, "Well what am I supposed to do?" RAMIREZ, "Well you have to talk to the guy." MENDOZA replied, "How am I going to talk to the guy if I'm telling you they took everything. I'm fucked. I'll head

that way. Okay?" RAMIREZ replied, "It went to shit. I knew you were going to come up with something [an issue]."

48.     At approximately 6:05 p.m., MENDOZA called RAMIREZ at RAMIREZ Phone. During the call, RAMIREZ asked, "Where's the other guy?" MENDOZA replied, "Well him too. They hit both of us. Let me see if I can head back but I don't want them to follow me." RAMIREZ replied, "Bring back what you have." MENDOZA replied, "Am I not telling you they took everything? If I can't come by today, I'll stop by tomorrow. I don't want them to follow me." RAMIREZ replied, "I don't believe anything but bring back what you have to bring back. These guys are real assholes [RAMIREZ's suppliers]." MENDOZA replied, "What the hell do you want me to bring? Am I not telling you what happened?" RAMIREZ replied, "No, I thought the guy was there and now you're coming to me with silliness. I thought you were on your way back already." MENDOZA replied, What am I telling you, we were just there when out of nowhere came this truck and this happened. But like I said, If I don't stop by tonight, I'll come by tomorrow." RAMIREZ replied, "These guys are going to fuck me. I don't know what you're thinking but you're going to have to pay for that. I am not going to pay for that."

## CONCLUSION

49.     Based on the foregoing, there is probable cause to believe that, on or about July 26, 2023, JUAN MENDOZA possessed with intent to distribute a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), and that, on or about July 26, 2023, JUAN RAMIREZ knowingly distributed a controlled substance, namely, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

ANGEL SANCHEZ
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone July 27, 2023.

Honorable YOUNG B. KIM
United States Magistrate Judge